# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
## Washington, D.C.

## UNITED STATES

v.

## Mark A. ROAN,
## Chief Warrant Officer (W-2), U.S. Coast Guard

## CGCMG 0226

## Docket No.  1277

## 23 July 2008

General Court-Martial convened by Commander, Maintenance and Logistics Command Atlantic. Tried at Norfolk, Virginia, on 10-13 October 2006.

| | |
|---|---|
| Military Judge: | CAPT Brian M. Judge, USCG |
| Trial Counsel: | LT Anthony S. Simpson, USCGR |
| Assistant Trial Counsel: | LCDR Patrick M. Flynn, USCG |
| Civilian Defense Counsel: | Michael D. Kmetz, Esquire |
| Appellate Defense Counsel: | LCDR Nancy J. Truax, USCG |
| Appellate Government Counsel: | LCDR Patrick M. Flynn, USCG |

## BEFORE
## McCLELLAND, KANTOR & TOUSLEY
Appellate Military Judges

McCLELLAND, Chief Judge:

Appellant was tried by general court-martial composed of members.  Contrary to his pleas, Appellant was convicted of four specifications of false official statement, in violation of Article 107, Uniform Code of Military Justice (UCMJ); and one specification of larceny, in violation of Article 121, UCMJ.  Two of the specifications of false official statement were held to be multiplicious for sentencing purposes.  The court sentenced Appellant to be confined for thirty days and to be dismissed.  The Convening Authority approved the sentence as adjudged.

Before this Court, Appellant has assigned five errors:

I.      The military judge erred in failing to instruct the members that to convict Appellant of larceny of cash, the cash must be identified as the money that was stolen.

II.     The military judge committed plain error by failing to give a spillover instruction after the Government's closing argument.

III.    The evidence is legally and factually insufficient to support a conviction of larceny.

IV.    The evidence is factually insufficient to support the conviction of false official statements.

V.     The military judge erred in admitting testimony regarding Appellant's March 2004 statement about theft aboard TAHOMA.

We reject the fifth assigned error summarily. The military judge did not abuse his discretion in admitting the testimony at issue. We address the other issues, and affirm.

Appellant was convicted of stealing $118,270 from the safe in the ship's office aboard his unit, Coast Guard Cutter TAHOMA, and of four false official statements he made in the course of the investigation of the larceny. The evidence that he was the thief was circumstantial, comprising among other things the facts that he had access to the SF-700 form on which the combination to the safe was recorded, and that currency amounting to over $100,000 but less than the missing amount, in denominations that came within the denominations that had been in the safe, was found in bags belonging to him in his father-in-law's house.

The four statements specified as false official statements concerned Appellant's last full day aboard TAHOMA, which was 24 May 2004. The first statement was to the effect that he went to bed in a motel on that date at approximately 10:00 p.m. In the second statement, he revised his story to say that he returned to the ship at approximately 10:00 p.m. on that date and reset a circuit in Radio at approximately 11:30 p.m. and then left the ship. In the third statement, he explained that he received a call earlier on that date from NCTAMS [a Navy communication station] stating that gear may have to be reset and the gear would be down until the ship reset the gear. In the fourth statement, which was part of the same written statement as the third, he stated that he left the ship around midnight.

**Facts**

2

The Money

On 21 May 2004, LT Jason Haag took on the duty of imprest fund custodian aboard TAHOMA (R. at 138). On that date, the combination to open the ship's office safe, in which the imprest fund was kept, was changed, after which only LT Haag knew the combination (R. at 138-40, 142, 190, 193, 195-96, 198, 220, 511). LT Haag recorded the combination on a form, SF-700, which was sealed in an envelope (R. at 140-41, 194-95, 217). The envelope was laminated between a pair of sticky transparent sheets and deposited in what was referred to as the watchstander's safe in the Radio space of the ship (R. at 197-98, 218). The watchstander's safe was a "two-person integrity" safe, meaning that each of two people must enter a combination in order to open it, two people must remain present at all times when it is open, and no one person should know both combinations (R. at 198-99). LT Haag's SF-700 was added to the "watch-to-watch inventory" for the watchstander's safe, meaning that if the safe was open, that SF-700 along with the other items on the inventory would be checked just before the safe was closed (R. at 224-25, 228).

On 24 May 2004, LT Haag, accompanied by an armed escort, ENS Rice, cashed two checks for the imprest fund amounting to $118,270 (R. at 143-47, 173; Prosecution Ex. 2). He received $68,020 in twenty-dollar bills, $40,050 in fifty-dollar bills, and $10,200 in one-hundred-dollar bills (R. at 150). There is nothing to indicate that the money was brand-new bills (R. at 350). He placed the cash in the ship's office safe in the same bag in which he had received it from the financial institution where the checks were cashed (R. at 150). The large sum was obtained in preparation for an extended patrol to South America (R. at 144), for which the ship was getting underway on 25 May (R. at 235). LT Haag next opened the safe on 31 May 2004 to conduct a quarterly audit, but the bag and money were gone (R. at 152).

Events of 24 May 2004

Also on 24 May 2004, Appellant was a chief petty officer aboard TAHOMA (R. at 234). He had been serving as communications chief and working in Radio (R. at 188), but on 24 May he was on the verge of being commissioned as a chief warrant officer, and was to depart on permanent change of station orders the next day (R. at 188, 234, 244, 258, 459). Chief Petty Officer Jaime Kinney was Appellant's relief as TAHOMA's communications chief, having

reported aboard on 17 May 2004 (R. at 187-88). ENS Boland, the communications officer, intended to have the combinations of the watchstander's safe changed on that date, and discussed this with Appellant in the morning (R. at 236). Appellant knew one of the combinations, as did Petty Officer Justin Byrd, and ENS Boland (as well as someone else) knew the other combination (R. at 236). In the afternoon, Appellant reported to ENS Boland that they had been unable to open the safe, as it was jamming (R. at 236). This had been a recurring problem over the preceding few weeks (R. at 220, 248, 259, 602-03). Appellant asked ENS Boland to give Petty Officer Byrd, who had the 24-hour Radio watch from that morning to the following morning (R. at 211, 256-57), the combination that ENS Boland knew, so that he and Petty Officer Byrd could continue to try to open the safe (R. at 237). This would mean that Petty Officer Byrd would know both combinations, which was improper, but the plan was that as soon as the safe was opened, ENS Boland would be called to Radio[1] and the combinations would be changed so that Petty Officer Byrd would know one new combination and ENS Boland would know the other (R. at 237). ENS Boland did give his combination to Petty Officer Byrd (R. at 237). Appellant and Petty Officer Byrd tried to open the safe beginning at about 1600 (R. at 271), without success (R. at 262-63), and then Appellant asked Petty Officer Byrd for ENS Boland's combination (R. at 264), which he gave to Appellant and Appellant attempted to open the safe (R. at 280); they eventually stopped, between 1830 and 1900, without succeeding in opening the safe (R. at 265).

Petty Officer Byrd left Radio at 2230 to go to bed, earlier than usual because he had been assigned by Appellant to depart at 0500 the next morning to pick up a code (R. at 268-69).

Petty Officer Kenton Farmer stood the TAHOMA quarterdeck watch from 1600 to 2000 on May 24, 2004. Between 1900 and 2000, he had a conversation with Appellant, who was leaving the ship with three or four duffel bags. Appellant said he was cleaning out his room to make room for the new chief, and going to a hotel for the night. He told Petty Officer Farmer to let the roaming security watchstander know that there might be an alarm going off in Radio later because of some testing by the Navy. (R. at 484-86.)

---

[1] ENS Boland was the OOD that day, except for a short period in midday when Appellant relieved him as OOD. (R. at 177, 181, 183, 237, 245, 249.)

Petty Officer Damien Maloney stood the TAHOMA quarterdeck watch from 2000 to midnight on May 24, 2004. When he began his watch, he received word from Petty Officer Farmer that some alarms might go off around midnight, which Appellant would take care of. He saw Appellant come aboard the ship at about 2300. Appellant told him that alarms might go off in Radio and he, Appellant, would take care of it. After his watch, at about 0030, Petty Officer Maloney saw Appellant on the ship's messdeck, drinking a glass of water. Petty Officer Maloney did not hear any alarms and was not made aware of any alarms. (R. at 492-95.)

Petty Officer Thomas Hamilton stood the TAHOMA roving security watch from 2000 to midnight on May 24, 2004. He had a conversation with Appellant that day around noon. Appellant told him that an alarm was expected to go off in Radio, likely after midnight, and asked him to pass on to other security watchstanders that if an alarm goes off in Radio, to contact him (Appellant). He passed on this information to his relief. Petty Officer Hamilton did not hear any alarms in Radio during his watch. (R. at 537-39.)

Petty Officer Jessica Robles stood a TAHOMA midwatch ending at 0400 on May 25, 2004. When she began her watch, she received word from Petty Officer Hamilton that the Navy may do some work affecting Radio which could cause an alarm to go off, for which Appellant should be contacted. Sometime during the middle of this watch, while making a round of the ship, she saw Appellant on the main deck. Concerning the alarm, she told him she hadn't heard anything, and he said nothing was likely to come up, but if it did, to let him know. Petty Officer Robles did not hear any alarms. (R. at 497-99.)

Petty Officer Steven Loitsch stood the TAHOMA quarterdeck midwatch ending at 0400 on May 25, 2004. When he began his watch, he received word that if there were any alarms in Radio, Appellant would take care of them. He saw Appellant leaving the ship between 0100 and 0200. Appellant told him that if he needed him or if there were an alarm, he, Appellant, had his cell phone. Petty Officer Loitsch did not hear any alarms. (R. at 503-05.)

5

Appellant had also told ENS Boland that on the night of 24 May 2004 the Navy was conducting some testing that would set off an alarm in Radio, and that he, Appellant, would come in so he could take care of it and silence the alarm. (R. at 244.)

The next morning, 25 May 2004, Petty Officer Byrd told ENS Boland that he and Appellant had been unable to open the safe the day before (R. at 244, 265), and that he, Petty Officer Byrd, was uncomfortable because he still had both combinations (R. at 265). ENS Boland then mustered in Radio all petty officers assigned to Radio, and eventually the safe was opened and the combinations were changed, so that Petty Officer Byrd no longer had both combinations (R. at 244-45).

<u>The Radio Room and Ship's Office</u>

There are two communication systems in Radio that have alarms.

There is an alarm associated with the DAMA system, which is a satellite communications system for use when the vessel is underway (R. at 204). The alarm goes off when codes are being entered, and when the satellite signal is lost. (R. at 205-06, 222, 272, 517, 602.) Codes were entered on the morning of 25 May 2004 (R. at 227). The Navy has a communication station (Naval Computer and Telecommunications Area Master Station, or NCTAMS) that provided services to TAHOMA (R. at 202-03). The Navy would work with TAHOMA to resolve any malfunction in the DAMA system and sometimes conducted fleetwide tests, but according to Chief Kinney, the Navy normally would not propose a test with an individual unit or conduct a test at night (R. at 206-07); according to Petty Officer Byrd, if the Navy did conduct a test, as soon as the test was done the equipment would come back up without need for any reset by a person onboard. If the Navy had warned of a test or an occasion to reset an alarm or circuit on 24 May 2004, Petty Officer Byrd, the watchstander that day, would have been the first to receive it, but he received no such message that day (R. at 267). Also, any such message should have been brought to Chief Kinney, but he did not receive any from anyone, including Appellant (R. at 201-02, 207, 211). Further, Chief Kinney was not aware of any problems with the DAMA system on 24 May 2004 (R. at 207). The DAMA system was running aboard TAHOMA on 24 May 2004 (R. at 272, 281, 520, 531, 602, 605).

The Navy's station (NCTAMS) maintains records of communications with ships that are its customers concerning malfunctions or testing. The station had no record of any such matters relating to TAHOMA for 24-25 May 2004 except for a communication shift on 25 May 2004. (R. at 524-25, 529-30.)

In addition to the Navy's station, a Coast Guard communication station (CAMSLANT) provided services to TAHOMA when the vessel was not underway and the DAMA system was not running, and assisted the Navy in providing services when the DAMA system malfunctioned. That station maintains records of provision of codes to customers, requests pertaining to codes, telephone conversations with customers, and contacts with the Navy pertaining to malfunctions. The station had no record of any such matters relating to TAHOMA for 24 May 2004. (R. at 514-18, 521-22.)

There is an alarm associated with the KWR-46 unit, which is a crypto unit that receives messages via satellite (R. at 207, 223). The alarm goes off when codes are being entered, and when the satellite signal is lost. (R. at 207, 223, 227, 273.) Codes are entered on the 1st, 8th, 15th, 22nd, and 29th of every month, after being received the day before (R. at 225, 227, 229-30). No special transmission of codes was received on 24 May 2004 (R. at 281).

These two alarms can be heard inside Radio, and if the door is open, they can be heard in the nearby ladderwell (R. at 208, 221-23, 275, 609). Chief Kinney did not receive any information about an alarm that may go off or a circuit that may need to be reset in Radio in the early morning hours of 25 May 2004 (R. at 211).

Access to Radio is via a vault door secured with a spin-dial combination and a cipher-code combination with buttons (R. at 209). The door should never be open except when someone is going through it (R. at 226). The access codes are changed after someone who worked in Radio departs permanently. Accordingly, the access codes were changed on the afternoon of 25 May 2004, after Appellant departed. (R. at 209.) There is an intrusion alarm in Radio, which, if it has been set, sounds when the door is opened, on the ship's bridge as well as

in Radio (R. at 208, 221-22, 488).  However, this alarm was rarely set or was inoperative (R. at 273-74).

According to Chief Kinney, the Navy could not set off an alarm in Radio (R. at 203, 205, 210).

During the period before the ship got underway on 25 May 2004, the ship's office door was normally locked, although not always.  The storekeepers and yeomen who worked there had keys, as did the OOD; other persons sometimes needed access to the printer in the office.  (R. at 595-96.)  Also, the duty cook's key ring, kept on the messdeck, included a key that opened both a storage area and the ship's office (R. at 307, 596).

## The Investigation

As previously noted, it was discovered on 31 May 2004 that the money LT Haag had placed in the ship's office safe on 24 May was missing.  On that date, the Coast Guard Investigative Service (CGIS) was requested to investigate the matter of money missing from TAHOMA.  Special Agents Sidoti and White met the ship at Guantanamo on 1 June 2004.  (R. at 287-88.)  During their investigation, they conducted a "trash pull," which revealed a razor blade and rubber gloves in the trash from Radio (R. at 301-02, 457).  In the Radio watchstander's safe they found the SF-700 that held the combination for the ship's office safe, as well as several other SF-700s.  The SF-700 for the ship's office safe was different from the others in that it was thicker and had some creases or lines on it.  (R. at 303.)  On closer inspection, it was determined that the SF-700 had a cut in the top of it.  Special Agent White was able to replicate the appearance and thickness of this SF-700 by laminating a blank SF-700, then cutting into it with a razor blade, then using a new sheet of laminate to re-seal it.  (R. at 312-21; Prosecution Ex. 23.)

No usable fingerprints were found on the SF-700 (R. at 322, 458), or on the ship's office safe (R. at 305, 462).

During a consensual search of Appellant's father-in-law's house on 7 June 2004, despite the fact that at the outset Appellant said there were no large amounts of money on the property

8

(R. at 371-72, 381), a CGIS special agent found a yellow duffel bag belonging to Appellant that contained $104,152 in currency (R. at 336, 355, 377, 409-10, 435-36; Prosecution Ex. 19-20), as well as a black bag belonging to Appellant that contained $2000 in traveler's checks and $660 in currency (R. at 336, 355, 440-41; Prosecution Ex. 18). The currency from both bags consisted of $67,580 in twenty-dollar bills, $37,000 in fifty-dollar bills, and the remainder in other denominations (Prosecution Ex. 19-20).[2] The bills bore dates of 1996, 1999, 2001, and 2004, including over $18,000 in 2004 bills (R. at 349, 351, 353).

Special Agents Sidoti and White interviewed Appellant on the night of 7-8 Jun 2004 (R. at 308, 392-94). After an initial interview, during which he was urged to recall everything that had happened, Appellant wrote a statement which became Prosecution Ex. 9, setting forth his activities on 24 May 2004. Prosecution Ex. 9, like his oral statements during the interview, omits mention of the watchstander's safe in Radio and the possibility of resetting an alarm, and states that he went to bed in a motel at approximately 10:00 p.m. (R. at 308-09, 395-98.) After he wrote the statement, he was asked about Petty Officer Byrd obtaining ENS Boland's combination to the watchstander's safe, and why members of the watch section would have said he was on the ship that night and talked about possible alarms in Radio. He indicated that those matters had slipped his mind, and he described a new series of events. (R. at 309-10, 399-401.) He wrote a new statement reflecting the new series of events (R. at 402-04), which became Prosecution Ex. 5, including information about efforts to open the watchstander's safe, and about resetting a circuit at around 11:30 p.m. and then leaving the ship. However, he could not recall what circuit he had reset or what alarm he had silenced (R. at 310). Concerning the source of the money found at his father-in-law's house, Appellant said the money came from savings bonds he had cashed, and gifts from his grandmother and other family members beginning in 1983 (R. at 351-52, 442). He said that in 2004 he had put in about $3,000 (R. at 351). Concerning why he kept money in a bag, he explained that he didn't trust his money in banks, preferring to have it

---

[2] The currency from the yellow duffel bag, Prosecution Ex. 19-20, is represented in the record by photographs, which provide no means of determining the denominations or counting the currency. The same is true of the black bag. The court members had the actual currency. As to the amounts contained in Prosecution Ex. 19-20, we accept as correct AE XXV and trial counsel's statements during arguments (R. at 560, 770), which are consistent in indicating that the currency in evidence included $37,000 in fifty-dollar bills and $67,580 in twenty-dollar bills; we reject as unreliable the testimony that there were $47,580 in twenty-dollar bills (R. at 338).

close to himself. He also said he intended to take the money to his new duty station to buy a home. (R. at 443.)

Special Agents Sidoti and White interviewed Appellant again on 11 June 2004 (R. at 444). At that time, Appellant brought some personal records and provided detailed information about the sources of the money, with substantial gifts from his grandmother and parents each year beginning in 1983, substantial amounts from savings bonds beginning in 1997, an insurance recovery, reenlistment bonus, several travel claims, and part-time employment, adding up to about $146,000 (R. at 352, 448; Prosecution Ex. 6). He also wrote another statement about his activities on 24 May 2004, which included the statement that he had received a call from NCTAMS concerning the need to reset certain gear, as well as the statement that he left the ship around midnight (R. at 450; Prosecution Ex. 7). During the interview, when Petty Officer Byrd's name was raised in regard to who might have stolen the money, he said, "Without a doubt, Petty Officer Byrd did not steal that money." (R. at 450.) His written statement contained the same idea, in the sentence, "ET3 Byrd's fingerprints should not show up on the laminated portion of the combo card in my opinion." (Prosecution Ex. 7.)

Other Evidence

Appellant testified that when he received gifts of money from relatives, it was his common practice to put it in a safe deposit box or in a container at home (sometimes after first depositing it in a bank account), in accord with practices he learned from his grandmother and mother (R. at 620-21, 647, 658). He testified that from August 1999 to July 2004, as reflected in the bank statements (Defense Ex. B), he withdrew $198,000 in cash, which came from $35,000 in savings bonds he had cashed in since 1997, the proceeds of his wife's stock in and retirement from grocery store chain Publix, and gifts from family members. (R. at 621-22, 668-70, 686.) His wife likewise testified that the money found in her father's house came from savings bonds, $28,000 from her retirement from Publix, and gifts (R. at 699-700, 711-12). She also testified that Appellant had kept money in the house during all of the 17 years of their marriage, although she would have preferred to put the money into CDs (R. at 700-01, 715).

The evidence at trial included bank statements from bank accounts belonging to Appellant and his wife for the five years preceding trial, and a large number of redeemed savings bonds, with redemptions beginning in 1997. There are bank deposits corresponding to over half of the savings bonds redeemed in the five years covered by the bank statements. There are few withdrawals in amounts that appear to correspond to the redeemed savings bonds. (Defense Ex. B, C.)

In his testimony, Appellant corroborated most of the evidence about his activities on 24 May 2004, admitted that he had been in Radio late that evening, and stated that he had silenced an alarm on the DAMA system that indicates traffic is backing up.

ENS Rice, the armed escort for transport of the $118,270 from financial institution to TAHOMA, drew the weapon he carried from the ship's armory on the morning of 24 May 2004, and returned it to the armory the same afternoon. The OOD gave him access to the armory at both times, with accompanying conversation at both times in which he informed the OOD about his mission to accompany LT Haag to pick up cash for the coming patrol. (R. at 173, 176-77, 181-82.) When he drew the weapon, the OOD was ENS Boland. When he returned it, the OOD was Appellant. (R. at 177, 181, 183.)

Appellant had a temporary assignment in approximately March 2004, while he was a chief petty officer, at a Coast Guard installation in St. Petersburg. Ms. Jana Conrey, a civilian working there, worked with Appellant during his temporary assignment. One day she walked into the room while Appellant was on the telephone. When he got off the telephone, she understood him to say there had been a theft on the boat of more than $100,000. She asked him why they had that much money on the boat, and he said they used cash when they go into foreign ports. (R. at 540-42, 552-556.)[3]

## Spillover Instructions

The military judge's instructions on findings included the following instruction:

---

[3] Ms. Conrey's testimony was the subject of Assignment of Error V.

> In determining whether the prosecution has met its burden of proof on any offense, you must weigh the evidence as it relates to the elements of that offense regardless of whether the prosecution has met its burden of proof with respect to any other offense. So, if the court finds from the evidence that the Accused committed an offense, that finding constitutes absolutely no support of any other alleged offense. In other words, you may not infer from one finding of guilt that the Accused has committed any other offenses.

(R. at 745.)

Thereafter, during his closing statement, trial counsel argued that Appellant's lies, both charged and uncharged, supported the larceny charge, and that the theft provided motive, supporting the intent-to-deceive element of the false official statement. Appellant now raises an issue he did not raise at trial: that this argument "impermissibly linked the larceny with the false statement, offering each as proof of the other" (Appellant's Br. at 12), requiring a curative instruction by the military judge.

As the military judge's "spillover" instruction states, the *finding* of guilt of one offense does not support any other alleged offense. That does not mean that evidence of one offense cannot support any other alleged offense. There is no prohibition against using a piece of evidence for more than one offense. If a piece of evidence is relevant to more than one charged offense, naturally it may be used to prove each offense to which it is relevant.

Specifically, charges of making false official statements during a crime investigation may naturally relate to a charge of committing the crime that was being investigated, as variations in a person's statements, or a particular false statement, about a matter may be evidence of the person's consciousness of guilt. *United States v. Daniels*, 56 M.J. 365, 369 (C.A.A.F. 2002); *United States v. Hurt*, 27 C.M.R. 3, 41 (C.M.A. 1958); *Wilson v. United States*, 162 U.S. 613, 620-21 (1896). Thus, the same untrue statements by Appellant that were charged as false official statements could be evidence of the charged larceny.

It is also obvious that a person's wrongdoing may provide motive for that person to make a false official statement, and thereby constitute evidence supporting a charge of false official

statement. Thus, if the members believed that Appellant took the money, they could at the same time conclude that his untrue statements were accompanied by an intent to deceive.

Trial counsel's argument did no more than make use of these concepts. It was not impermissible, and no curative instruction was required.

### Instruction on Identity of Stolen Money

The military judge's instructions on findings included the following instruction:

> If the facts establish that the property was wrongfully taken from the possession of the Coast Guard, and that shortly thereafter it was discovered in the knowing, conscious and unexplained possession of the Accused, you may infer that the Accused took the property. The drawing of this inference is not required.

(R. at 741.)

Appellant did not object to this instruction at trial, but now asserts that it was deficient, allowing the court to "stack inference upon inference to convict Appellant of larceny." (Appellant's Br. 11.)

Appellant's argument is based on old Air Force cases applying Manual for Courts-Martial, 1951, ¶ 138a:

> Proof that a person was in possession of recently stolen property or a part of it raises a presumption that he stole it, and, if it is shown that the property was stolen from a certain place at a certain time and under certain circumstances, that he stole it from such place at such time and under such circumstances.

One of the cases Appellant cites calls this an ancient and universally recognized principle of law, noting that the presumption is more accurately termed a permissible inference. *United States v. Pagerie*, 15 C.M.R. 864, 871 (A.F.B.R. 1954). That case and an earlier case it cites add this gloss:

> Before this presumption can arise, however, two primary conditions must be satisfied:

     a.   The property must be identified as the stolen property.

     b.   Personal, conscious, and exclusive possession of the accused must be established.

*United States v. Simmons*, 5 C.M.R. 628, 631 (A.F.B.R. 1952).

To the extent that this formulation requires a linear analysis of the evidence, we do not accept it. It can be read to mean that there must be independent evidence that the property found in the accused's possession was the same property missing before a conclusion could be reached that the accused stole that property. However, where there is not clearcut independent evidence of the property's identity, the permissible inference described in the military judge's instruction is not inoperative, but only weakened. Indeed, *Simmons* asserts that when the prosecution relies solely on the "presumption" to establish guilt, the identification must be more definite and positive than in cases where corroborative evidence exists. *Id.* Thus, *Simmons* does not call for a definitive finding that the conditions exist before the inference can be "turned on," without which the inference is "off." Instead, the strength of the inference depends on the strength of the identification proof.

The instruction at issue, like the paragraph from MCM (1951), describes an instance of circumstantial evidence and the inference that may be drawn from it. Circumstantial evidence, by its nature, allows the drawing of inferences (whether they are so common as to be memorialized in legal references or not). It is not expected or required that this will be done in a formulaic way. As the military judge instructed the members, "There is no general rule for determining or comparing the weight to be given to direct or circumstantial evidence. You should give all the evidence the weight and value you believe it deserves." (R. at 744.) He further instructed, "In weighing the evidence, you are expected to use your common sense and your knowledge of human nature." (R. at 745.)

In this case, there was some evidence tending to identify the money found in Appellant's possession as the missing money, namely, the evidence of the bills' denominations (R. at 338; Appellate Ex. XXV) and the fact that the earliest date on any of the bills was 1996 (R. at 353). This is far from conclusive as to the identity of the money, but it is some evidence bearing on its identity.

Appellant urges that the military judge should have told the members that in order to draw the inference he had described, they must also conclude that the money found in Appellant's possession was the same money stolen from TAHOMA. We do not agree that this instruction was required. [4] Having not raised it at trial, Appellant has waived the issue in the absence of plain error. We see no error here, and certainly no plain error.

**Sufficiency of Evidence**

It is undeniable that this case depends on circumstantial evidence. This case contains a myriad of circumstantial evidence, none of it conclusive by itself, but together building a convincing picture of Appellant's guilt. Our analysis of the facts follows.

At the outset, the evidence is clear that the theft occurred between 24 May and 31 May 2004, and that the SF-700 bearing the combination of the safe that contained the money was compromised (cut, then re-sealed) between 21 May and 1 June 2004. This coincidence, combined with the near-absence of evidence that the combination of the safe could have been compromised by other means and the absence of evidence implicating the custodian of the funds (beyond the obvious fact that he knew the combination of the safe), leads to a strong hypothesis that the theft was carried out by the person who compromised the SF-700.

We can state with considerable confidence that the only people who had unsupervised access to the SF-700 were Appellant and Petty Officer Byrd. There is no other evidence implicating Petty Officer Byrd, and Appellant himself stated categorically that Petty Officer Byrd did not steal the money. [5]

Appellant knew that large amounts of cash might be carried aboard ship if it was going to a foreign port. The ship was, indeed, going to foreign ports; although there is no direct evidence that he knew this, it is more than possible that, as a member of the ship's company, he knew where it was going when it got underway on 25 May 2004, even though he would not be aboard

---

[4] The cited Air Force cases do not suggest that an instruction to this effect is required. Rather, the boards of review applied the conditions in determining, under Article 66, UCMJ, whether the findings were correct.
[5] This is stronger evidence that Appellant stole the money than that Petty Officer Byrd did not.

for the trip. Appellant received confirmation from ENS Rice, the armed escort, that cash had been brought aboard during the day on 24 May 2004.

Access to the office in which the safe containing the cash was located could be had by way of a key kept on the messdeck.

On 24 May 2004, Appellant told several people (the OOD and other watchstanders) that he had received a phone call from the Navy concerning an alarm that would go off in Radio that night, which he would attend to. This was an improbable story, according to persons knowledgeable about such matters, Chief Kinney and Petty Officer Byrd, but Appellant did not mention it to them; they did not know of such a call, although they were in positions making it likely that they would have known if such a call had been received. There was no Navy or Coast Guard record of such a call. In light of all the evidence, we conclude that there was no such call, and Appellant invented the story to explain his presence aboard the ship that night to those on duty.

When interviewed by the special agents investigating the theft, he initially claimed he had gone to sleep at 10:00 p.m. that evening without returning to the ship after supper, staying away from the truth that might have invited attention to himself as a suspect. This claim is the subject of specification 1 of the false official statement charge. When confronted with the fact that the special agents had contrary information, Appellant maintained the improbable story about the call from the Navy and his response to it, as alleged in specifications 2 and 3 of the false official statement charge. He continued to attempt to minimize his presence aboard the ship, claiming he had left the ship around midnight, as alleged in specification 4. We conclude that he did intend to deceive his listeners in each instance.

The money placed in the safe on 24 May 2004 and later missing consisted of $68,020 in twenty-dollar bills, $40,050 in fifty-dollar bills, and $10,200 in one-hundred-dollar bills. The money found on 7 June 2004 in Appellant's bags at his father-in-law's house consisted of $67,580 in twenty-dollar bills, $37,000 in fifty-dollar bills, $2000 in traveler's checks, and $232 in other denominations. In light of all the evidence, we conclude that at least 99% of the

currency was part of the money missing from the safe. We do so notwithstanding Appellant's story that the money came from gifts from relatives beginning in 1983, from redemptions of savings bonds, and from his wife's retirement from Publix. The bank statements do not identify the payees of the checks that were written against the checking account. Hence, although the statements do not directly contradict Appellant's story, they are also consistent with the possibility that the proceeds of savings bonds and other sources of funds Appellant identified were spent.

We are convinced beyond a reasonable doubt that Appellant is guilty of the charges and specifications as found by the court.

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the findings and sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Judges Kantor and Tousley concur.



For the Court,

L. I. McClelland
Chief Judge

17